## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br> *ex rel.*<br>**DAVID SHERWIN**<br>**1735 Brantley Road, Apt. 1410**<br>**Fort Myers, Florida 33907**<br><br>**BRINGING THIS ACTION ON**<br>**BEHALF OF THE UNITED STATES**<br>**OF AMERICA**<br>**c/o Channing Phillips, Esquire**<br>**Acting U.S. Attorney**<br>**for the District of Columbia**<br>**555 Fourth Street, N. W.**<br>**Washington, D. C.  20001**<br><br>         **and**<br><br>**c/o Eric Holder, Esquire**<br>**Attorney General of the United States**<br>**Department of Justice**<br>**10th & Constitution Avenue, N. W.**<br>**Washington, D. C.   20530**<br><br>                 **Plaintiffs**<br><br>    **v.**<br><br>**OFFICE DEPOT**<br>**6600 North Military Trail**<br>**Boca Raton, Florida 33496**<br><br><br><br>                 **Defendant** | **CIVIL ACTION NO.**<br><br>**FILED UNDER SEAL**<br><br>**COMPLAINT FOR VIOLATIONS**<br><br>**OF FEDERAL FALSE CLAIMS ACT**<br><br>**JURY TRIAL DEMAND** |

## <u>COMPLAINT</u>

1.       This is an action to recover damages and civil penalties on behalf of the

United States of America arising from the false claims made by Office Depot (hereinafter

Defendant), in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

2. The False Claims Act (hereinafter the Act), originally enacted in 1863 during the Civil War, was substantially amended by the False Claims Amendments Act of 1986 and signed into law on October 17, 1986. It was amended again and signed into law on May 20, 2009. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the Act. Congress acted after finding that fraud in federal programs and procurement is pervasive and that the Act, which Congress characterized as the primary tool for combating fraud in government contracting, was in need of modernization.

3. The Act provides for any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government, including attorneys' fees. The Act allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery. The complaint is to be filed under seal for sixty days (without service on the Defendants during such sixty-day period) to enable the Government (a) to conduct its own investigation without the Defendant's knowledge, and (b) to determine whether to join the action.

4.     Based on these provisions, Plaintiff/Relator, David Sherwin, seeks to recover damages and civil penalties arising from Defendant's overpricing schemes causing Boards of Education and school districts throughout the United States that receive federal funding from the U.S. Department of Education, an agency of the U.S. Government, pursuant to  Title I, II and III of the Improving School Act of 1994, 20 USC 2701 et seq. and the No Child Left Behind Act, Public Law 107-110, 20 USC 6301 et seq. to pay false and fraudulent bills.

5.     Plaintiff Sherwin has direct and independent knowledge of the following conduct that violated the False Claims Act. The Defendant is selling office products and school supplies to school districts and Boards of Education (hereinafter schools) in all fifty (50) states and intentionally overbilling the schools in several ways. Therefore, the Defendant is causing the schools to pay false overpriced bills and then use federal funds to pay these false claims in violation of the False Claims Act. Based on these provisions, Plaintiff/Relator seeks to recover damages and civil penalties arising from Defendant's presentation of false requests for payment for various office products and school supplies purchased by schools throughout the United States as a result of their participation in the United States Communities/Los Angeles County contract with the Defendant.

## PARTIES

6.     Plaintiff/Relator, David Sherwin is a resident of the state of Florida and was employed by the Defendant as an Account Manager III in Office Depot's Business

Solutions Division from 1996 to April 11, 2008. As an Office Depot Account Manager III, the Plaintiff/Relator personally handled the accounts for the following Florida school districts and Boards of Education: Lee County School Board, Collier County School Board, Charlotte County School Board, and Sarasota County School Board, in addition to a variety of other local entities throughout Florida. Plaintiff/Relator has direct and independent knowledge of the false statements and/or claims presented by the Defendant Office Depot to school districts throughout the United States as alleged herein.

7.     Defendant, Office Depot, is a national company headquartered in Boca Raton, Florida that sells school supplies, office products and furniture throughout the United States.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331 and 31 U.S.C Sec. 3732 et seq.which specifically confers jurisdiction on this Court for actions brought pursuant to the Federal False Claims Act, 31 U.S.C. 3729 et seq.

9.     The Court has jurisdiction and venue over this matter because the Defendant does business in Washington, D.C. with schools that receive funding from the U.S. Department of Education, a federal government agency headquartered in Washington, D.C.

**SUMMARY**

10.     Office Depot presented false and fraudulent claims to and made and used false and fraudulent statements and records to get claims paid by diverse school districts and Boards of Educations throughout the United States that were signatories on the U.S. Communities/Los Angeles County Contract to purchase at contracted volume discount rates office products and school supplies and equipment.

11.     Office Depot systematically committed the following False Claims Act violations:

a.     by fraudulently inducing school districts and Boards of Education (hereinafter schools) throughout the United States to switch to a higher cost program by telling the schools that it was better financially for the schools, which was false;

b.     by increasing prices without notice or explanation as required by the contract and on more than the two dates allowed by the contract, January 1 and July 1 of each year;

c.     by rebate fraud in not providing the schools with the benefit of rebates from Office Depot's suppliers;

d.     by not providing the schools with the best price given to Office Depot's best customers as required by the contract; and

e.     by deceptively manipulating WEB based pricing resulting in overcharges.

**ALLEGATIONS**

12.     U.S. Communities Government Purchasing Alliance ("US Communities")

is a nonprofit instrumentality of government designed to assist government agencies and educational institutions in making purchases of products and services. It is headquartered in Walnut Creek, California. Its Advisory Board is made up of purchasing officials from various local government agencies across the United States. The founding co-sponsors of U.S. Communities are the National Association of Counties, National League of Cities, Association of School Business Officials International, the United States Conference of Mayors and the National Institute of Governmental Purchasing.

13.     All U.S. Communities contracts are competitively solicited by a lead public jurisdiction. More than 31,000 public government agencies and instrumentalities throughout the United States use various U.S. Communities contracts and suppliers to procure approximately One Billion Dollars ($1,000,000,000) annually in goods and services.

14.     The County of Los Angeles, California is the lead agency on behalf of U.S. Communities that solicited the office products contract with the Defendant Office Depot. The Defendant was initially awarded the office products contract by the County of Los Angeles in 1995. The current Office Depot Master Agreement No. 42595 was issued on November 8, 2005 and became effective on January 2, 2006. The expiration date of the current Office Depot Master Agreement No. 42595 is January 1, 2010 with a provision for two (2) one year extensions. The maximum extended expiration date is January 1, 2012.

15.     Hundreds of schools throughout all fifty (50) states purchase office products and school supplies from the Defendant Office Depot, pursuant to the Los Angeles County contract with Office Depot (hereinafter 'LA Contract"). Many of these schools receive funding from the U.S. Department of Education. The Plaintiff/Relator saw  on a Florida school district's documents a reference to Title I which indicated that Title I funds from the U.S. Department of Education were being used to pay for the office and school supplies. The following schools are a partial list of schools purchasing products from Office Depot: Lee County School Board (FL), Hillsborough County Schools (FL), Long Beach Unified School District (Cal), Los Angeles Unified School District (Cal), Oakland Unified School District (Cal), South San Francisco School District (Cal), Hazlewood School District (MO), USD 259 (Wichita, Kansas), Bethlehem School District (PA), Calumet Park School District (ILL), Florence County School District I (SC), Franklin Pierce School District (WA), Gaston County Schools, (NC), Coonomowac  Area School District (WI), Sylvania City Schools, (OHIO), Toledo Public Schools (OHIO), Tuscaloosa City Board of Education (AL), and Montgomery  Public Schools (AL). Attached hereto as Exhibit 1 is a complete list of California, Texas and Florida schools that were Office Depot customers pursuant to the LA County Contract.

16.     The Plaintiff/Relator alleges that  schools throughout the country using the LA Contract purchased millions of dollars of goods from Office Depot in 2005, 2006, 2007, 2008 and 2009. Nationwide, local and state government agencies and

instrumentalities throughout the United States, purchased approximately $700 million annually pursuant to the LA Contract with Office Depot.

17.     The Plaintiff/Relator alleges that Exhibit A of the LA Contract is entitled Office Supplies, Pricing and Discounts. Exhibit A was known by Office Depot personnel as Option 1. Exhibit A-3 of the LA Contract is entitled Office Supplies, Pricing and Discounts and was known by Office Depot personnel as Option 2. There is a price differential between Options 1 and 2 with the prices in Option 2 being higher than the prices in Option 1.

18.     Option 1 pricing was the only pricing option available in the LA Contract from its inception in 1995 until January 2, 2006. For ten years, customers using the LA Contract only had Option 1 for pricing. Option 1 pricing is based upon a discount of 45% (for most classes of office products) off of Office Depot's current list price with a 15% Gross Profit ("GP") floor. List price is the recommended manufacturers' list price as set by the manufacturer of the product each year and is not the price paid by Office Depot.

19.     The Plaintiff/Relator alleges that Office Depot does not manufacture most of the office products and school supplies it sells. Office Depot purchases the products from office supply manufacturers and wholesalers such as Sandford, Smead, S.P. Richards and Hewlett Packard, just to name a few.

20.     The various office supply manufacturers and wholesalers that sell

products to the Defendant set the recommended manufacturer's list price. The recommended manufacturer's list price does not equate to what Office Depot actually paid the manufacturer to purchase the item. The Defendant does not share the actual price it paid to purchase the products from the manufacturers and wholesalers as the Defendant maintains that price as confidential.

21.     Option 1, Exhibit A of the LA Contract employs the term "Gross Profit (GP) floor' in its pricing equation. Gross Profit floor is the actual cost to Office Depot for the product (invoiced less annual rebate % from manufacturer) plus 15% of the actual cost. The GP floor represents the lowest price for which the item can be sold on the LA Contract. Office Depot does not share with the LA Contract customers how its GP floor is actually calculated. The fact that the LA Contract customer must rely upon Office Depot's honesty in calculating the GP floor enabled the Defendant to secretly increase its revenue and to defraud its customers.

22.     The Plaintiff/Relator alleges that the following is an example of how Office Depot calculates the Gross Profit floor. If one assumes that the manufacturer states that the "recommended list price" of a typical office product like a binder costs $5.00, Office Depot would record the List Price of the binder as $5.00 in its catalog and website. It is the normal business procedure for Office Depot to pay the manufacturer less than the List Price for the binder. If one assumes that Office Depot paid the manufacturer $1.00 for the binder, using the Option 1 price formula, the LA Contract customer would pay $2.75 for the binder. That calculation is as follows: Office Depot List Price which was

provided by the manufacturer ($5.00) minus 45% discount ($2.25), $5.00 - $2.25 = $2.75. Office Depot would then automatically calculate its Gross Profit (GP) floor. If one assumes again that Office Depot paid the manufacturer $1.00 for the $5.00 binder, Gross Profit would be the cost to Office Depot ($1.00) plus 15% of the cost ($. 15). The Gross Profit floor would be $1.15. The GP floor of $1.15 would then be compared to the $2.75 which represents the price calculated using the first part of the formula, 45% discounted from list price. In this example, using the Option 1 pricing formula, the LA Contract customer would pay Office Depot the higher of the two prices ($2.75 versus $1.15) In this example, the LA Contract customer would pay $2.75.

23.    The List Price provided by the manufacturer/wholesaler is shown in the Office Depot catalog and on the Office Depot ordering website. Only Office Depot can calculate the GP floor because the cost to Office Depot is maintained as confidential by Office Depot. The price the customer pays is posted on the customer's Office Depot Business Solutions Division order website. However, there is no information provided as to the discount off list or how the price listed was in fact calculated.

24.    The Plaintiff/Relator alleges that a second example will demonstrate how the Defendant secretly manipulates the price causing schools to pay higher prices than that for which they contracted. If one again assumes, as was done in paragraph 22, that

the manufacturer states the recommended List Price is $5.00 for the binder, but Office

Depot buys that $5.00 binder from the manufacturer for $3.00; as we learned from the

prior example, 45% off of the $5.00 binder price makes the price of the binder $2.25.

However, before the final price can be determined Office Depot must make a calculation

of its GP floor plus 15%. In this example, Office Depot paid $3.00 for the binder instead

of $1.00 as in the example in paragraph 22. Fifteen percent of $3.00 equals $.45,

making the GP floor plus 15% price to be $3.45. As the GP floor plus 15% is the lowest

amount that Office Depot will sell the binder for, the LA Contract customers must pay

$3.45 for the binder because the GP floor price is $3.45 for the binder. On its face, this

appears to be fair. The problem lies in the fact that the customer has no knowledge of

what numbers are used to calculate the GP floor and Office Depot fraudulently

manipulates the confidential numbers used to calculate the GP floor.

25.     The Plaintiff/Relator alleges that Office Depot consistently makes the LA

Contract customer pay the GP floor minimum price which is a number the LA Contract

customer cannot calculate because the numbers to calculate the GP floor are

confidential and closely held by Office Depot. The GP floor price often means increased

income to the Defendant.

26.     Option 2 pricing is based on a 10% discount off of Office Depot's Website

pricing. Office Depot's Website pricing for Option 2 is a different number than Option I's

List Price less 45%. Although the LA Contract provides that prices can only be changed

with prior notice and only on two dates in a year, January 1 and July 1, Office Depot's

Website pricing was changed by Office Depot at any time and on more than 2

occasions. On many occasions, the Plaintiff/Relator observed the Office Depot Website

prices changing on a daily basis for a variety of products.

27.     The Plaintiff/Relator alleges that overall, Option 2 pricing is more

expensive for the customer than Option 1 pricing. Option 2 pricing runs between 3% to

6% higher for customers than Option 1 collectively for total market basket of items

purchased. In determining the 3% to 6% higher costs for Option 2 over Option 1 means

that some items did not change price, some items changed price periodically, while

some items changed price regularly. This occurs because Office Depot's Website

pricing was constantly changing, sometimes on a daily basis.

28.     The Defendant, Office Depot, earned from 2% to 3% increased profit

when the customer used Option 2 rather than Option 1.

29.     The Plaintiff/Relator alleges that the Defendant, after 2006, changed its

website pricing on a regular basis despite the fact that the LA Contract specifically

dictates that prices would only change twice a year, on January 1st and July 1st of each

contracting year.

30.     The Plaintiff/Relator alleges that some time during 2006, he, along with all

Office Depot Account Managers were specifically instructed by Office Depot's management to shift their customers from Option 1 to Option 2 now that Option 2 was made part of the LA Contract. The Defendant's Account Managers were instructed to tell their customers that Option 2 was a better deal for them when the Account Managers knew that was false.

31.     The Plaintiff/Relator alleges that by transferring LA Contract customers from Option 1 to Option 2, Office Depot was insuring that it would generate higher income and increase Office's Depot's profitability. When the Defendant's Account Managers told their customers that Option 2 was a better choice, they were also telling the customer that the customer's costs would be lower which was not true.

32.     The Plaintiff/Relator alleges that in 2007, he and the other Office Depot Account Managers were told by their Office Depot supervisors that Option 2 was a higher cost to the customers but that they were not to reveal that information to the customers. The Defendant instructed its employees to lie to its customers and tell them that Option 2 was the better deal for them.

33.     The Plaintiff/Relator alleges that Office Depot's deceptive practice of switching customers from Option 1 to the newly available Option 2 was for the purposes of increasing revenue and profitability for Office Depot and deceiving their customers into paying overall higher prices than the best price terms of the contract.

34.    The Plaintiff/Relator alleges that after the implementation of Option 2, in January 2006, some LA Contract customers were switched from Option 1 to Option 2 without any notification or explanation.

35.    The Plaintiff/Relator alleges that in his experience as an Office Depot Account Manager, he noticed that most, if not all, of his customers, did not verify the prices that were paid for office products and school supplies. The customers relied upon Office Depot to accurately bill the customer for the items purchased. Office Depot, knowing that the typical school purchasing office supplies and school supplies pursuant to the LA Contract did not verify the prices on the bill but merely assumed that the price as supplied by Office Depot was accurate and in compliance with the LA Contract, given that Office Depot switched its customers to Option 2 by telling them that it was a better deal for them.

36.    In a letter dated June 9,2008 from Timothy Gibney, Assistant Commissioner - Procurement, for The State of Georgia to Office Depot's attorneys regarding The State of Georgia's decision to suspend and debar Office Depot from contracting with State of Georgia agencies, Mr. Gibney stated: "While the number of pricing irregularities go up or down from week to week, it became clear that the burden would be on the state to constantly monitor the Office Depot online State of Georgia government catalog to assure correct pricing rather than on Office Depot."

37.    Between February and August of 2006, pursuant to instructions the

Plaintiff/Relator received from his supervisors, John Riley and Jim Olsen, the Plaintiff/Relator contacted his customers and advised them to switch from Option 1 to Option 2 of the LA Contract. The Plaintiff/Relator, in accordance with the instructions he received from his supervisors told his customers that Option 2 was a better deal for the customers.

38.     The Plaintiff/Relator alleges that sometime between February and August 2006, he was instructed by his Office Depot managers to take the lead in The State of Florida in moving Florida customers from Option 1 to Option 2. He was also instructed to report on the customer's reactions to the proposed change as well as devise ways to minimize the customer's knowledge of the specific issues associated with the change from Option 1 to Option 2.

39.     In the Plaintiff/Relator's annual appraisal for 2006 prepared by his supervisor, Jim Olsen, under the title, "Core Work Objectives: Profitability, Manager Result Comments," it says, " David will be changing remaining US Communities customers to Option 2. Further increasing IMU [IMU means profitability]."

40.     In a series of emails throughout 2006 and early 2007, from members of Office Depot's Florida and Public Sector Management Team which included John Riley, Jim Olsen, Dave Burt, Bob Cetina, Jeffrey Wierenga, Gina Hobson, Julia Mendez and Gary Howard, Office Depot Account Managers were directed to change their LA Contract customers from Option 1 to Option 2. In these emails it was stated that the

reason Account Managers were instructed to move LA Contract customers from Option 1 to Option 2 was to increase revenue and profitability for Office Depot. Although Options 1 and 2 were clearly offered as part of the LA Contract, Office Depot received increased revenue and profits from Option 2. Office Depot intentionally decided to encourage its customers to select Option 2 without informing the customer that Option 2 would be more costly to the customer. Representatives of Office Depot intentionally mislead its LA Contract customers in order to increase the company's revenue and profits.

41.     The majority of schools were LA Contract customers on Option 1 prior to the institution of Option 2 in January 2006. All of the Plaintiff/Relator's customers had to be switched from Option 1 to Option 2. Office Depot's main "selling" point on having Option 2 pricing was that it avoided the confusion of having retail pricing on occasion lower than the LA Contract pricing. It was common knowledge among Office Depot employees that when the catalog year switched in July of 2006 and 2007, significant numbers of accounts were switched to Option 2 without any notification to the customer of the switch. The pricing change was disguised by the release of a new catalog. After the addition of Option 2 pricing to the LA Contract beginning in 2006, all new customers were signed up for Option 2 with little or no explanation.

42.     Christopher Jones worked for Office Depot as an Account Manager II in Georgia handling accounts for the City of Roswell, Georgia, Atlanta Technical College

and Atlanta Metro pursuant to the LA Contract. Mr. Jones told the Plaintiff/Relator that he believed that Lynn Honeycutt, Regional Sales Director for Office Depot, mandated that all LA Contracts in Georgia should be moved from Option 1 to Option 2. Mr. Jones stated that several meetings were held with the Georgia Account Managers regarding Office Depot's policy of moving all LA Contract customers to Option 2 in order to increase profitability for Office Depot.

43.     In December 2007, Office Depot initiated a plan to increase revenue and profitability of the LA Contract for Office Depot branded products. Office Depot's plan intentionally resulted in increased prices to the customers. The LA Contract provided that Office Depot could increase prices on January 1st and July 1st of each year provided written notice and documentation of the proposed increases were provided to Los Angeles County ISD Purchasing Division, the department that acts as the administrator of the LA Contract, in writing. Beginning in December 2007, Office Depot price changes were done secretly without the knowledge of the LA Contract administrator or the customers and in violation of the LA Contract.

44.     In March 2008, the Plaintiff/Relator saw spreadsheets prepared by Office Depot management showing the list price changes on Office Depot brand products. The Plaintiff/Relator observed on the spreadsheets that some list prices were increased two and three times within a sixty (60) day time period. These spreadsheets showed the multiple price changes that were not shared with the LA Contract administrator or the customers.

45.     In late January or early February 2008, the Plaintiff/Relator attended an Office Depot sales meeting in Tampa, Florida where a power point presentation was made by his supervisor, Jim Olsen, District Sales Manager, Major Accounts, about the plan to increase prices as described in paragraph 43. Office Depot Account representatives from throughout Florida attended this meeting. During the sales meeting, the Account Representatives were told that this initiative was a part of Office Depot's Business Solutions Division's national initiative to increase the company's profitability. They were also told at the Tampa sales meeting that this plan to increase prices on the Office Depot brand products for the LA Contract was part of a companywide initiative to increase revenues and profits for all customers whose pricing was subject to a discount off list pricing structure like the LA Contract.

46.     On March 3, 2008, Jeffrey Wierenga, Office Depot National Program Manager - Public Sector, sent an email to Chris Penny, with copies to the Plaintiff/Relator, Jim Olsen and Jean Davis, in which Mr. Wierenga discussed the problems being encountered by LA Contract customers because of the periodic increases in Office Depots list prices on Office Depot brand products.

47.     The Plaintiff/Relator alleges that the list price changes were noticed by an audit in the period of February 2008 to March 2008 by his customer, the Lee County (Florida) Board of County Commissioners. Sometime during February and/or March 2008, the Plaintiff/Relator had conversations with Jeffrey Wierenga in which the

Plaintiff/Relator learned that numerous Option 1 customers were noticing the pricing increases.

48.     In a letter dated June 9, 2008 from Timothy Gibney, Assistant Commissioner-Procurement for The State of Georgia to attorneys representing Office Depot regarding Office Depot's suspension and debarment, Mr. Gibney quotes from Office Depot's response in which Office Depot acknowledges that it uses a "global system" for pricing. A global system for pricing means that when Office Depot changes a list price, it applies to all customers. Thus list prices were changing for the LA Contract periodically and not just on January 1st and July 1st as the LA Contract requires. As Office Depot instituted numerous list price increases, within its global pricing system, Office Depot was also increasing the list price for LA Contract Option 1 customers which included all schools on Option 1 pricing. The list price increases were done, as presented at the Tampa sales meeting, to increase the price on a product and consequently, the company's profit margin, for those customers where a discount off list price is the primary pricing method.

49.     The Lee County Board of County Commissioners was a customer of the Plaintiff/Relator. On or about February 2008, the Lee County Board of County Commissioners discovered numerous examples of pricing changes which were presented to the Plaintiff/Relator's Sales Administrator, Kitty Couch, in a spreadsheet on a weekly basis.

50.     Office Depot receives significant manufacturer rebates. These manufacturer rebates have a significant effect on the actual cost of the product paid by Office Depot to its supplier manufacturers.

51      Option 1 to the LA Contract provides for a discount from the Office Depot Catalog list price of 45% with a 15% Gross Profit (GP) floor which is the actual cost to Office Depot by the manufacturer plus 15%. The List Price is the price determined by the manufacturers such as, Sandford, Smead, and Hewlett Packard, for most items. The actual cost of the item from which the GP floor is based should be the actual cost Office Depot paid the manufacturer less the percentage rebate received by Office Depot from the manufacturer. Office Depot manipulates this cost to its advantage thus secretly increasing the cost to the customer. For example, List price of item xyz is $100.00. The 45% discount brings the price to the customer to $55.00. However, if Office Depot's "says" without factual proof or documentation that its cost is $50.00, the Gross Profit ( GP) floor would kick in and Office Depot would charge the customer $57.50 rather than $55.00 ($50.00 cost plus 15% = $57.50). Because of the GP floor, the customer would pay an additional $2.50. That amount may appear negligible; however when such small increases occur across thousands of products, Office Depot's revenue will increase. Of significance is that, if Office Depot receives a 20% rebate from the manufacturer, then the pricing should actually be as follows: Office Depot's invoiced cost from xyz company is $50.00, less the 20% annual rebate to Office Depot making Office Depot's actual cost $45.00. Thus, the customer should pay the $100.00 list price less 45% of $55.00 since it would be above the real GP floor which reflects the 20% rebate from the manufacturer

making the actual cost to Office Depot $51.75 ($45.00 plus 15%). The LA Contract

provides that the GP floor is the minimum amount a customer must pay for the item. By

manipulating the GP floor by excluding the manufacturer's rebates, Office Depot has

misrepresented the actual cost of the item causing the customer to pay a higher price.

52.    The Plaintiff/Relator alleges that Office Depot often receives rebates from

manufacturers. However, Office Depot does not subtract the manufacturer's rebates it

periodically receives before Office Depot charges the LA Contract customer "list price

less 45% with a 15% GP floor". This causes the price to the LA Contract customer to be

slightly to significantly higher than it would have been if the rebates had been factored in

to the actual cost from which the GP floor base is established.

53.    The Plaintiff/Relator alleges that Option 1 is based upon manufacturers list

price less 45%. Therefore, the rebates given to Office Depot from the manufacturers

should be reflected in the base line cost from which the 15% GP floor is established.

Office Depot throughout the term of the LA Contract has not passed along the

manufacturers' rebates to the customers intentionally falsifying Office Depot's actual

cost. Office Depot has lied in the implementation of the LA Contract by its failure to

accurately account for its product cost by failing to factor in rebates, thus causing higher

unauthorized pricing to the customer.

54.    Finally, the LA Contract Master Agreement provides that the customers be

given the "best price". The LA Contract with Office Depot provides as follows:

PRICE GUARANTEE: Unless otherwise provided herein, prices are
maximum for the period of this agreement. In the event of a price decline,
or, should you at any time during the life of this agreement sell the same
material or device under similar quantity and delivery conditions to The State
of California, or legal district thereof, or to any county or Municipality
within The State of California at prices below those stated herein, you will
immediately extend such lower prices to the County of Los Angeles.

55.    As the LA Contract is used by a variety of government agencies and

instrumentalities throughout the United States it was understood by Office Depot and the

various state and local agencies and instrumentalities that used the LA Contract to

purchase office supplies that the provision quoted in Paragraph 54 applied to all of those

entities as well.


56.    Despite the contract provision quoted in Paragraph 54 Office Depot does

not adequately monitor its various contracts and, thus, does not always give LA Contract

customers the best price. For example, multiple governmental bids that are not a party to

the LA Contract, have multiple pricing matrix. The State of Georgia and Polk County

Schools in Florida have such matrix. Within these matrixes are various items and classes

of items that are priced lower than the prices in the LA Contract. Steve Schmidt,

President, Office Depot, Business Solutions Division, stated in his June 4,2008 letter to

Steve Hamill, General Manager, US Communities, that "[i]t is no surprise to anyone that,

given the number and complexity of Office Depot's contracts, pricing disparities can arise

for a host of reasons outside Office Depot's control...". The Plaintiff/Relator

acknowledges that Office Depot's pricing is complex. However, Office Depot is hiding

behind that complexity, and intentionally and covertly defrauding schools throughout the

United States out of the benefits of a clear contractual provision, in order to hide its true costs from its LA Contract customers in violation of the contract provisions.

## COUNT I
## FEDERAL FALSE CLAIMS ACT
## CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS

57.     This is a civil action by the Plaintiff, the United States of America and the Relator, David Sherwin, on behalf of schools throughout the United States who receive funds from the U.S. Department of Education, against the Defendant Office Depot under the Federal False Claims Act.

58.     Plaintiff/Relator incorporates and realleges by reference the allegations in Paragraphs 1-56 of the Complaint and further alleges as follows:

59.     The Defendant, at all times relevant to this action, sold office products and school supplies to schools throughout the United States who received funding from the U.S. Department of Education pursuant to the LA Contract and intentionally falsified the prices of the office products and school supplies in order to increase fraudulently the amount of revenue it received from the schools.

60.     The Defendant Office Depot from a date on or before July 16, 2002 to the present date, knowingly caused to be presented to schools throughout the United States false or fraudulent claims for payment or approval for office products and school supplies sold to numerous schools where the prices were falsified to defraud the

schools out of the benefits of its volume discount contract with Office Depot, resulting in great financial loss to the schools.

61.     Because of the Defendant Office Depot's conduct as set forth in this Count I, schools throughout the United States suffered actual damages in excess of Millions of Dollars. The exact amount to be determined at trial.

**COUNT II**
**FEDERAL FALSE CLAIMS ACT CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY SCHOOLS THROUGHTOUT THE UNITED STATES**

62.     This is a civil action by the Plaintiff, the United States of America, and Relator David Sherwin, on behalf of schools throughout the United States against the Defendant Office Depot under the Federal False Claims Act.

63.     Plaintiff/Relator incorporates and realleges by reference the allegations in Paragraphs 1-56 of the Complaint and further alleges as follows:

64.     The Defendant, at all time relevant to this action, sold office products and school supplies to schools pursuant to the LA Contract and intentionally falsified the prices of the products in order to increase fraudulently the amount of revenue it received from the schools.

65.     The Defendant Office Depot from a date on or before July 16, 2002 to the

present date knowingly caused false records or statements to be made or used to get

false or fraudulent claims to be paid or approved by the schools, which defrauded the

schools out of the benefits of its volume discount contract with Office Depot, resulting in

great financial loss to the schools.

66.     Because of the Defendant Office Depot's conduct as set forth in this Count

II, the schools suffered actual damages of millions of dollars. The exact amount is to be

determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States of America, demands:

67.     That judgment be entered in its favor and against Defendant Office Depot,

as follows:

a.     On Count I (False Claims Act; Causing Presentation of False
Claims) for triple the amount of the school's actual damages, plus
civil penalties of no more than Eleven Thousand Dollars ($11,000)
for each false claim pursuant to 31 U.S.C. Sec. 3729 et seq. and

b.     On Count II (False Claims Act; Causing False Statements To Be
Used To Get False Claims Paid Or Approved by the Schools) for
triple the amount of the school's actual damages plus civil penalties
of no more than Eleven Thousand Dollars ($11,000)  for each false
statement pursuant to 31 U.S. C. Sec. 3729 et seq.

68.     For all attorneys' fees and costs of this civil action; and


69.     For such other and further relief as the Court deems just and equitable.


70.     Further, the Relator, on its behalf, requests that it receive the maximum amount as permitted by the Federal False Claims Act, 31 U.S. C. Sec. 3729 (d), of the proceeds of this action or settlement of this action collected by schools, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relator requests that its percentage be based upon the total value recovered.


Respectfully submitted,

MCKNIGHT & KENNEDY, LLC

BY: _____
H. Vincent McKnight, Jr.
D.C. Bar No. 293811
Altomease R. Kennedy
D.C. Bar No. 229237
8601 Georgia Avenue
Suite 1010
Silver Spring, Maryland 20910
(301) 565-5281


**Counsel for Plaintiff/Relator**
Plaintiff/Relator hereby demands trial by jury.

_____
Altomease R. Kennedy,  Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Complaint, Filed Under Seal, was sent by Federal Express, postage prepaid, this _____18_____ day of November, 2009, to:

Channing Phillips, Esquire
Acting U.S. Attorney for the District
 of Columbia
555 Fourth Street, N. W.
Washington, D. C.  20001

Eric Holder, Esquire
Attorney General of the United States
Department of Justice
10th & Constitution Avenue, N. W.
Washington, D. C.  20530

Altomease R. Kennedy, Esq.